IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) CRIMINAL ACTION NO. 16-00239-KD-B |
| | ) |
| ASHLEY NEWTON | ) |
|     Defendant | ) |

## ORDER

This matter is before the Court on Defendant's Motion to Suppress and Dismiss and the United States' response and memorandum. (Docs. 27, 30, and 38). On March 13, 2017, the Court held a hearing on the motion to suppress. Defendant Ashley Newton ("Newton") and her counsel Patrick Finnegan were present. Assistant United States Attorney Sinan Kalayoglu was present on behalf of the United States. The additional briefing permitted at the hearing has concluded. (Docs 44-45). Upon consideration of the relevant law, evidence, and arguments the motion to suppress and dismiss is **DENIED**.

    **I.**    **Facts**

On January 6, 2016, between 12:00 a.m. and 1:00 a.m., Louisiana State Trooper Ryan Zimmerman ("Zimmerman") initiated a traffic stop of a vehicle being driven by Newton. The stop occurred near mile marker 38.5 on Interstate 12 east in Louisiana and was recorded by the dashboard camera in Zimmerman's patrol car. The basis for the stop was Newton's alleged violations of Louisiana Revised Statutes 32:79 (improper lane usage) and 32:53 (improper display of license plate).

As Zimmerman approached the vehicle from the passenger side, Newton rolled down the window. Zimmerman "smelled a strong odor of air fresheners coming out of the vehicle" and saw

1

three air fresheners hanging from the gear shifter. (Doc. 43 at 88).[1] He requested Newton's license and asked her if she had been drinking. Newton answered that she had not. Zimmerman observed that Newton was "very nervous" and was "shaking" when looking for her license. (Doc. 43 at 88-89). Newton informed Zimmerman that she was a student. Zimmerman testified that he found the placement of textbooks in Newton's backseat unusual as they were strewn about rather than contained in her backpack. (Doc. 43 at 87-88).

When Zimmerman asked Newton where she was coming from, she stated that she was coming from her grandmother's house on Jefferson Street[2] in Baton Rouge, Louisiana. (Doc. 43 at 11). Zimmerman was familiar with the Baton Rouge area but did not recognize this location. As a result, he looked up the location on the computer in his patrol car and could not find it, causing him to be suspicious of Newton's statement to him about her trip. (Id.).

As Zimmerman prepared to return Newton's license and documents to her, he instructed her to exit the vehicle so he could explain the license plate violation. Both Zimmerman and Newton stood at the rear of her vehicle as he explained the problem with her plate. Within seconds, Zimmerman asked her whether there were any drugs in the vehicle. She answered in the negative. When specifically asked whether there was marijuana in the vehicle, Newton said no but volunteered that she had previously been stopped and that law enforcement had found a part of blunt containing marijuana in her vehicle. After this exchange, Zimmerman presented a consent to search form to Newton. The video shows Zimmerman holding a flashlight above the form in order for Newton to read it. (Doc. 43 at 16). Newton takes a few seconds to read the form, and signs it. (Id. at 20). The subsequent search of Newton's vehicle lead to the discovery of three kilo sized bricks of cocaine, found in a backpack in the backseat. (Doc. 43 at 21).

---

[1] All citations to Doc. 43 are to the transcript of the suppression hearing held on March 13, 2017.
[2] There is some dispute whether Newton actually stated "Jefferson Street" on the tape. Defense counsel contends she actually said "Jackson Street," though Zimmerman heard "Jefferson Street." Even if Zimmerman misheard her, his belief at the time of the interaction was that Newton said "Jefferson Street."

2

## II. Analysis

There are three issues before the Court: 1) whether the initial traffic stop violated the Newton's rights under the Fourth Amendment; 2) whether the duration of the stop was unreasonable in light of *Rodriguez v. United States*, 135 S. Ct. 1609 (2015); and 3) whether Newton consented to the search of her vehicle. As detailed herein, the answer to the first two questions is no, and the Court finds that Newton knowingly and voluntarily consented to the search of her vehicle. Accordingly, Defendant's motion to suppress is **DENIED**.

### A. Legality of the Traffic Stop

As the Eleventh Circuit has explained:

> "The Fourth Amendment protects individuals from unreasonable search and seizure." *Chanthasouxat,* 342 F.3d at 1275. A traffic stop, however, is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with *Terry,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. *Chanthasouxat,* 342 F.3d at 1275. When determining whether an officer had probable cause to believe that a traffic violation occurred, the "officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment." *United States v. Simmons,* 172 F.3d 775, 778 (11th Cir.1999) (quotation omitted). The Constitution also permits police officers to conduct a brief investigatory stop, *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), "if they have a reasonable, articulable suspicion based on objective facts that" an individual is engaged in criminal activity. *United States v. Powell,* 222 F.3d 913, 917 (11th Cir.2000). A determination of reasonable suspicion is based on the totality of the circumstances, and "[i]t does not require officers to catch the suspect in a crime. Instead, [a] reasonable suspicion of criminal activity may be formed by observing exclusively legal activity." *United States v. Acosta,* 363 F.3d 1141, 1145 (11th Cir. 2004) (citations omitted). Additionally, the issue is not whether the particular officer involved "actually and subjectively had the pertinent reasonable suspicion, but whether, given the circumstances, reasonable suspicion objectively existed to justify [the investigatory stop]." *United States v. Nunez,* 455 F.3d 1223, 1226 (11th Cir.2006).

*United States v. Harris*, 526 F.3d 1334, 1337–38 (11th Cir. 2008). At the conclusion of the suppression hearing, the Court determined that Officer Zimmerman was credible. Zimmerman testified that he initiated the traffic stop based on Newton's improper lane usage and obstructed license plate. For the reasons stated on the record at the suppression hearing, the Court has already

3

determined that the traffic stop was based on probable cause and therefore did not violate the Fourth Amendment. The Court permitted additional briefing on the issues of consent and whether the extension of the stop was supported by reasonable suspicion.

### B.     Duration of the Traffic Stop

The Court turns to Newton's contention that her Fourth Amendment rights were violated because her detention was prolonged in violation of the United States Supreme Court's holding in *Rodriguez v. United State,* 135 S. Ct. 1609 (2015). In *Rodriguez,* the Court held "that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation." *Id*. at 1612 (internal quotations and citations omitted). The Supreme Court explained that in addition to issuing a ticket or warning, a police officer's "mission includes ordinary inquiries incident to [the traffic] stop." *Id*. at 1615 (quotation marks omitted). Those inquiries "involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id*. Because they "serve the same objective as enforcement of the traffic code"—namely, "ensuring that vehicles on the road are operated safely and responsibly"—those inquiries do not unconstitutionally extend the traffic stop. *See id*. at 1614-15. Finding that police may not extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a canine sniff, the Supreme Court remanded the case to the Court of Appeals for its consideration "whether reasonable suspicion of criminal activity justified detaining Rodriguez beyond completion of the traffic infraction investigation[,]" which would permit a prolongation of the stop. *Id*. at 1616-17.

The Eleventh Circuit has outlined the reasonable suspicion standard:

> "[R]easonable suspicion" is determined from the totality of the circumstances, and from the collective knowledge of the officers involved in the stop. Such a level of suspicion is obviously considerably less than proof of wrongdoing by a preponderance of the evidence, or even the implicit requirement of probable cause that a fair probability that evidence of a crime will be found. Nevertheless, "reasonable suspicion" must be more than an inchoate "hunch," and the fourth amendment accordingly requires that police articulate some minimal, objective justification for an investigatory stop.

*United States v. Tapia*, 912 F.2d 1367, 1370 (11th Cir. 1990) (citations omitted); *see also United States v. Simms*, 385 F.3d 1347, 1354–55 (11th Cir. 2004) (finding reasonable suspicion based on nervous conduct, a prior history of drugs, and a questionable story about the defendant's travel plans).

Upon consideration of the applicable law and the evidence before it, the Court finds the stop was not unjustifiably prolonged and Defendant's Fourth Amendment rights were not violated. During the stop, Zimmerman and Newton's conversation, coupled with Zimmerman's observations of the Defendant and her vehicle, established reasonable suspicion, which supported a prolonged stop. Zimmerman observed that Newton was very nervous, and testified that this nervousness exceeded the normal amount of nervousness exhibited by persons who have been stopped for traffic violations. (Doc. 43 at 10). He also testified that her voice patterns were changing and that she lost eye contact with him. In Zimmerman's opinion, this indicated that "she's digging for something to tell me what's going on, where she was coming from, where she was going to." (Doc. 43 at 11). Zimmerman also noticed a number of air fresheners on the gear shifter in Newton's vehicle. Based on his training and experience, this was a signal of the possibility of contraband in a vehicle.[3] He also found the manner in which her textbooks were placed in her backseat to be unusual, indicating that the backpack was not being used for books.

---

[3] Zimmerman testified about the placement of the air fresheners stating, "That strikes me as odd to be on a gear shifter because a lot of people put them on their rear view mirrors. But in the past word has been out if you are looking for criminals or illegal narcotics and you see that, it's called a felony Christmas tree if you see a few of those hanging on the thing. So people have been moving the around the vehicle. They move them on gear shifters. They move them onto the seats, just to try to throw a dog off the scent of narcotic odors." (Doc. 43 at 12-13).

Additionally, Zimmerman had lived or worked in the Baton Rouge area for around 5 years and was not familiar with the location Newton told him she was coming, causing him to be suspicious. (Doc. 43 at 88). After he ran the location in the computer and found no such location, he determined that Newton had not been forthcoming with where her trip had begun. He also testified that he found it unusual for a person to be leaving their grandmother's home at such a late hour.

For the first 9:50 of the video of the traffic stop, all of Zimmerman's questions or statements furthered the purpose of the traffic stop. This includes his questions regarding the presence of illegal substances in the vehicle. Based on the totality of the circumstances, coupled with Zimmerman's experience, the Court finds that he developed the requisite reasonable suspicion for extending the stop. Based on this determination, the Court need not determine whether the stop had ended and morphed into a consensual encounter. Additionally, the time between Zimmerman returning Newton's paperwork and license to her, and obtaining consent via the consent form was roughly 15 seconds. This 15-second delay, supported by reasonable suspicion, did not unreasonably extend the traffic stop.

    C.    **Newton's Consent**

Newton claims "any consent by Ms. Newton under the coercive circumstances present during the stop was not voluntary, and therefore not effective." (Doc. 27 at 7). In *United States v. Acosta*, the Eleventh Circuit explained,

> "A consensual search is constitutional if it is voluntary; if it is the product of an 'essentially free and unconstrained choice.' " *United States v. Purcell,* 236 F.3d 1274, 1281 (11th Cir.2001) (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 225, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973)). Voluntariness is a question of fact based on the totality of the circumstances. *Id.* (citation omitted). "The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily." *United States v. Blake,* 888 F.2d 795, 798 (11th Cir.1989) (citing *United States v. Massell,* 823 F.2d 1503, 1507 (11th Cir.1987)). As we stated in *Blake,* determining whether consent was "voluntary is not susceptible to neat talismanic definitions; rather, the inquiry must be conducted on a case-by-case analysis." 888 F.2d at 798 (citing *Schneckloth,* 412 U.S. at 224–25, 93 S.Ct. at 2046).

6

363 F.3d 1141, 1151 (11th Cir. 2004).

The Court concludes that Newton consented to the search of her vehicle and that her consent was voluntary. When Zimmerman presented her with a consent to search form[4], the video shows Newton reading over the form before signing it. She also asks Zimmerman a question about why she would be searched if there is no reason to search her and he directs her to read the form. Throughout their interaction, Newton had no trouble understanding or communicating with Zimmerman. The lack of difficulty demonstrates her level of intelligence and her ability to comprehend the contents of the consent form.

Newton repeatedly takes issue with Zimmerman's failure to inform her of her right to refuse consent. In *Schneckloth v. Bustamonte,* the Supreme Court held that a suspect need not know of his right to withhold consent in order for the consent to be valid. 412 U.S. 218 at 248-49. ("[W]hile the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent.). "In assessing voluntariness, the inquiry is factual and depends on the totality of the circumstances.... In evaluating the totality of the circumstances underlying consent, the court should look at several indicators, including the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found." *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001).

---

[4] The consent to search form Newton signed stated, "In order to cooperate in an investigation being conducted by the Louisiana Office of State Police, I Ashley Nicole Newton residing at [redacted] Old River Road, Vancleave, MS 39565 do hereby voluntarily authorize ST. Ryan Zimmerman [illegible] of the Louisiana Office of State Police to search black 2004 Toyota Camry MS/JJV121 and its contents, which are owned or controlled by me and remove any items the Louisiana Office of State Police deems pertinent to their investigation, providing a receipt is furnished for the removed items. No promise, [illegible], or coercion of any kind has been made against me by the Louisiana Office of State Police and I have been informed by the above named officer that I may refuse to consent to search and that I may revoke my consent to search at any time."

Newton and Zimmerman communicated clearly and amicably during the stop. Newton's intelligence level and understanding of the situation appears to be above average, which is consistent with her apparent ability to complete college coursework. There is no absolutely no evidence from the video of any coercion or duress imposed by Zimmerman.[5] Moreover, there is no evidence or indication from the recording that Zimmerman prevented Newton from thoroughly reviewing the consent form before Newton chose to sign it.

### III. Conclusion

Upon consideration of the foregoing, Newton's motion to suppress and to dismiss is **DENIED**.[6]

**DONE** and **ORDERED** this **4th** day of **April 2017**.

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**CHIEF UNITED STATES DISTRICT JUDGE**

---

[5] The Court finds Newton's argument that Zimmerman positioned his body in a threatening manner while speaking with Newton unpersuasive.

[6] Newton's motion to dismiss is based on the sufficiency of the evidence. In criminal proceedings, there is no summary judgment mechanism. See *United States v. Critzer,* 951 F.2d 306, 307 (11th Cir.1992) (*per curiam*). A motion to dismiss an indictment does "not provide for a pre-trial determination of the sufficiency of the evidence," and "[t]he sufficiency of a criminal indictment is determined from its face." *United States v. Salman,* 378 F.3d 1266, 1268 (11th Cir. 2004) (quotation marks omitted). To avoid dismissal, the charging document "must contain the elements of the offense intended to be charged, and sufficiently apprise the defendant of what he must be prepared to meet." *United States v. Sharpe,* 438 F.3d 1257, 1263 (11th Cir. 2006) (quotation marks omitted). "It is well-settled that 'a court may not dismiss an indictment ... on a determination of facts that should have been developed at trial.'" *Id*. quoting *United States v. Torkington,* 812 F.2d 1347, 1354 (11th Cir.1987).